## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

AMBROSE SYKES,                          :
                                        :
                Plaintiff,              :
                                        :
        v.                              :       Civ. No. 06-072-LPS
                                        :
THOMAS CARROLL, et al.,                 :
                                        :
                Defendants.             :

---

Ambrose Sykes, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Catherine C. Damavandi, Esquire, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware.  Counsel for Defendants.


## MEMORANDUM OPINION


November 18, 2011
Wilmington, Delaware

**STARK, U.S. District Judge:**

## I.    INTRODUCTION

Plaintiff, Ambrose Sykes ("Sykes"), an inmate at the James T. Vaughn Correctional

Center (formerly known as the Delaware Correctional Center) ("VCC") in Smyrna, Delaware,

filed this lawsuit pursuant to 42 U.S.C. § 1983.  Sykes appears pro se and has been allowed to

proceed in forma pauperis.  (D.I. 4)  Pending before the Court are the parties' Cross-Motions for

Summary Judgment.  (D.I. 72, 77)  The Court has jurisdiction pursuant to 28 U.S.C. § 1331.  For

the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment and will

deny Plaintiff's Motion for Summary Judgment.

## II.    BACKGROUND

Sykes was arrested on November 29, 2004 for a number of offenses including first degree

murder, kidnapping, burglary, rape, theft, and abuse of a corpse.  (D.I. 74 at A1)  He entered the

VCC on November 30, 2004 and was placed in the general pretrial population, where he

remained until early July 2005.  (*Id.* at A1, A12, A16)  In June 2006, Sykes was convicted of

murder, and the jury voted to impose the death penalty.  (*Id.* at A8)  After being sentenced on

September 21, 2006, Sykes was transferred to the tier for death row inmates located in maximum

security housing.  (*Id.* at A16)

Earlier, on June 21, 2005 (during the time Sykes was housed in general pretrial

population), because the State of Delaware was seeking the death penalty, a "proof positive"

hearing was held in the Superior Court of Kent County, Delaware, before the Honorable William

L. Witham, Jr. in accordance with Article I, Section 12 of the Delaware State Constitution.  (*Id.*

at A4)  The Court ruled that the State had presented sufficient evidence to allow the State to

move forward in seeking the death penalty against Sykes. (*Id.*)  As a result, Sykes' original bail was revoked.

Following the "proof positive hearing," Sykes' custody status was reviewed by the VCC staff. (*Id.* at A13)  According to Ron Hostermann ("Hostermann"), a treatment services administrator at the VCC, such reviews occur for the safety of the pretrial detainee, the safety of other persons who are housed with him, and the safety of prison personnel. (*Id.* at A13)  In preparing his affidavit, Hostermann reviewed Sykes' institutional file, but Hostermann had not been involved in the reclassification of Sykes in 2005.  During the relevant time-period, Sykes' counselor was Traci Johnson ("Johnson").[1] (*Id.* at A12)

Hostermann opines that a pretrial detainee facing the death penalty is a higher escape risk. (*Id.*)  Also, Sykes' case received media attention (which was monitored by the VCC staff), so it would have been known to other pretrial detainees. (*Id.*)  In early July 2005, Sykes was moved from general pretrial population in Building B of VCC to the Security Housing Unit ("SHU") in a section of the facility that houses pretrial detainees who require a higher level of security. (*Id.*)  Defendant Thomas Carroll ("Warden Carroll"), former VCC Warden, was asked the reason that Sykes was housed in SHU, and he responded that during his tenure it was his position that an individual could be considered for housing in the SHU pretrial area based upon the security needs of the institution and the determination that the individual presented a significant security

---

[1]Johnson is no longer employed with the Delaware Department of Correction ("DOC"). (D.I. 74 at A12)  Johnson, a named defendant, was not served with process and was dismissed on March 24, 2010, pursuant to Fed. R. Civ. P. 4(m). (*See* D.I. 66)

risk if housed in the general pretrial unit. (*See* D.I. 45 at Interrog. No. 3) Sykes was not placed in isolation, protective custody, or with death row inmates.[2] (*Id.*)

Due to the higher security level, pretrial detainees and inmates housed in SHU do not have the frequency of movement and privileges that inmates housed in other areas of the VCC do. (D.I. 74 at A14) There are some restrictions on the frequency or duration of some privileges as compared to the general population – due to security reasons. (*Id.* at A14) According to Hostermann, while Sykes was housed in SHU as a pretrial detainee, he had access to the commissary, the law library, visitation, and recreation. (*Id.* at A14, A23, A35, A39-43, A50-51)

Sykes' girlfriend was told that he was moved, not as punishment, but because such a move was "normal" for inmates facing capital punishment. (D.I. 83 at B51) Sykes had not been in any trouble, nor had he experienced any problems with inmates or guards. (*See* D.I. 60 at Ex. Jenny Lyn St. Jean letter) Johnson told Sykes that nothing could be done because of his charge and that he was moved because of the possible penalty in his criminal case. (D.I. 11, 69) Johnson also told Sykes that "privileges are just that and being housed where they are taken is not a punishment." (*Id.*) Johnson told Sykes' girlfriend that the move was "to protect the prison if anything were to happen," such as Sykes hurting himself or others. (D.I. 60 at Ex. Jenny Lyn St. Jean letter)

Sykes submitted a grievance on October 27, 2005, complaining of his transfer to SHU. (D.I. 60 at ex. grievance) The grievance was returned as "non-grievable" and, on November 5, 2005, Sykes wrote to Warden Carroll and Defendant David Holman ("Holman") explaining that he had done nothing to warrant placement in SHU and requesting a return to regular pretrial

---

[2]Sykes refers to the housing assignment as isolation. (*See* D.I. 77)

status. (D.I. 25) Warden Carroll and Holman did not respond to the letter or change his status. (*Id.*)

Apparently on an unknown date in 2006, Sykes wrote to Defendant Elizabeth Burris ("Burris"), who was at the time the Deputy Warden at the VCC. (D.I. 84 at March 13, 2007 memo) Burris told Sykes on March 13, 2007 that she did not have an opportunity to answer every inmate letter in 2006. (*Id.*) Burris advised Sykes that, if she had not responded and an issue remained, to write back as she was again answering every inmate letter. (*Id.*)

Sykes contends he was not given a written explanation for his move; notice of, or an opportunity to attend, a hearing to allow him an opportunity to respond to any allegations; and that there was no review of his status during the fifteen months he was held in SHU. (D.I. 25, 69) No Defendant recalls whether there was a hearing regarding Sykes' placement in SHU. (*See* D.I. 45 at Interrog. No. 4; D.I. 51 at Interrog. No. 4; D.I. 55 at Interrog. No. 4)

Sykes provides the names of defendants in several high profile capital cases who were allowed to remain in the general population pretrial. For example, Darrel Page was allowed to stay in pretrial for years, until he was caught with contraband; Chauncy Starling was allowed to stay in pretrial for three years, until he was sentenced;[3] Gary Ploof was allowed to stay in pretrial until he was caught with a tattoo gun; and Juan Ortiz was allowed to go to pretrial after a brief stint in SHU and was only moved after an altercation.[4] (*See* D.I. 84)

---

[3]Starling was housed in SHU on or about May 8, 2001, while awaiting trial on a capital offense. In December 2001, he was moved from SHU to general population and housed there until he was sentenced on June 10, 2004. (D.I. 84 at Starling aff.)

[4]Ortiz was arrested on July 6, 2001, and housed in the prison infirmary for two weeks before he was moved to SHU on July 21, 2001. He remained in SHU until January 21, 2002 when he was moved to open population, where he stayed until November 2002. In November

Sykes seeks an immediate injunction to have his rights and privileges reinstated. He also seeks compensatory and punitive damages for the time he was housed in SHU pretrial. (D.I. 11)

## III.  LEGAL STANDARDS

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the clams in question. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). Pursuant to Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . ."

---

2002 he returned to SHU and remained there during his capital trial. There was no review of "why [he] was sent to SHU." (D.I. 84 at Ortiz memo)

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 247-49; *see also Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87 ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

Defendants Warden Carroll, Burris, and Holman ("Defendants") move for summary judgment on the grounds that: (1) moving Sykes to maximum security was based upon legitimate security interests and non-punitive purposes and, therefore, did not violate his due process rights; (2) the official capacity claims are barred by the Eleventh Amendment of the United States Constitution; and (3) they have qualified immunity. Sykes moves for summary judgment on the grounds that: (1) Defendants violated his procedural due process rights when he was transferred to isolation without notice, hearing, or review; and (2) he was treated differently from similarly situated pretrial detainees in violation of his substantive due process rights.

6

## IV.    DISCUSSION

### A.    Eleventh Amendment

At the time Sykes filed his Complaint, he was housed in SHU pretrial. The Complaint

seeks injunctive relief to reinstate Sykes' rights and privileges. Defendants move for summary

judgment on the official capacity claims raised against them. They note that, given Sykes'

subsequent conviction and the death penalty sentence, the request for injunctive relief is moot.

Sykes contends that, because Defendants are sued in their individual capacities, they are not

entitled to Eleventh Amendment immunity. He goes on to argue that he will return to the status

of a pretrial detainee if any phase of his conviction is overturned.

The Eleventh Amendment shields states from suits by individuals absent a state's

consent. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). "[A] suit against a state

official in his or her official capacity is not a suit against the official but rather is a suit against

the official's office. As such, it is no different from a suit against the State itself." *Will v.*

*Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (internal citations omitted). Thus,

§ 1983 claims for monetary damages against a state or a state official in his official capacity are

barred by the Eleventh Amendment. *See id.* The State has not waived its immunity from suit in

federal court; although Congress can abrogate a state's sovereign immunity, it did not do so

through the enactment of 42 U.S.C. § 1983. *See Brooks-McCollum v. Delaware*, 213 F. App'x

92, 94 (3d Cir. Jan. 11, 2007) (not published).

The Eleventh Amendment permits, however, suits for prospective injunctive relief against

state officials acting in violation of federal law. *See Ex parte Young*, 209 U.S. 123 (1908). "This

standard allows courts to order prospective relief, as well as measures ancillary to appropriate

7

prospective relief." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (internal citations omitted).

Sykes argues that if any phase of his conviction is overturned, he will return to the status of a

pretrial detainee. Because injunctions regulate future conduct, a party seeking prospective

injunctive relief must demonstrate a real and immediate threat of future harm as opposed to a

merely speculative or hypothetical threat. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111

(1983) (stating plaintiff lacked standing to enjoin police use of chokeholds absent sufficient

likelihood that he would be wrongfully choked by police in the future). Sykes' position that,

should his conviction be overturned, he would again become a pretrial detainee is purely

speculative.[5] Accordingly sovereign immunity applies, and summary judgment is appropriate as

to this issue.

For the above reasons, the Court will grant Defendants' Motion for Summary Judgment

as to the Eleventh Amendment immunity issue.

## B. Due Process Claims

Sykes' allegations that the pretrial detention violated his due process rights can be divided

into two claims: (1) a substantive due process claim that the conditions of Sykes' confinement in

SHU were punitive in nature and, therefore, violated his fundamental right as a pretrial detainee

to be free from punishment; and (2) a procedural due process claim that Defendants failed to

follow adequate procedures protecting Sykes' right to be free from unnecessary SHU detention.

Defendants move for summary judgment on the grounds that the transfer of Sykes to maximum

---

[5]Sykes' conviction and sentence to death by lethal injection were affirmed by the Delaware Supreme Court on January 24, 2008. *See Sykes v. State*, 963 A.2d 261 (2008), *cert. denied*, __U.S.__, 129 S.Ct. 452 (2008). On October 19, 2009, Sykes filed an amended motion for postconviction relief in State court. *See Sykes v. Danberg*, Civ. No. 09-076-LPS (D. Del.) at D.I. 12, ¶ 2. The disposition of that matter is unknown to the Court.

security was based upon the VCC's legitimate security interests and did not violate Sykes' constitutional rights. Sykes moves for summary judgment on the basis that he was moved to SHU without explanation, hearing, or an opportunity to respond to any allegations, his status was not reviewed during the fifteen months he was housed in SHU, and the conditions in SHU amounted to punishment prior to adjudication of his criminal case.

### 1.    Substantive Due Process

Pretrial detainees have a liberty interest in being free from punishment prior to conviction, under the Due Process Clause. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979). "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 538. Therefore, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539. In the absence of substantial evidence in the record to indicate that corrections officials have exaggerated their response, courts should ordinarily defer to the expert judgment of such officials in determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and in operating the institution in a manageable fashion, given that said considerations are peculiarly within the province and professional expertise of corrections officials. *See id.* at 540 n.23.

9

Unconstitutional punishment typically includes both objective and subjective components. *See Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). The objective component requires an inquiry into whether "the deprivation [was] sufficiently serious," while the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind." *Id.* (internal quotation marks omitted).

Sykes argues that Defendants produced no evidence that he posed an actual threat to the institution's security. Hostermann's affidavit, however, belies Sykes' position. Hostermann's affidavit shows that Sykes' classification was appropriate based upon prison security concerns. Sykes has not refuted that he was transferred from general population to SHU because of concerns for his safety and those around him. In particular, Sykes was facing the death penalty and DOC officials have determined that those facing the death penalty are escape risks. In addition, Sykes' criminal case received much media attention, and this caused prison officials concern. Notably, Sykes acknowledges that the transfer was based upon the pending charges and he was told that "it was not punishment." Nothing in the record suggests that the transfer to SHU was punitive.

While Sykes' privileges in SHU pretrial were not the same as those he had in general population, as a pretrial detainee he nevertheless enjoyed privileges including commissary rights, visits, use of the telephone, and the ability to exercise. Sykes wrote to Burris, Warden Carroll, and Holman after his transfer to SHU pretrial, none of whom responded to his letters. Nonetheless, the failure of prison officials to respond to the letters is not a constitutional violation. *See, e.g., Wilson v. Horn*, 971 F.Supp. 943, 947 (E.D. Pa.1997), *aff'd*, 142 F.3d 430

10

(3d Cir. 1998) (stating prison officials' failure to respond to inmate's grievance does not state a constitutional claim).

Finally, the only evidence of any Defendant's possible personal involvement in the transfer to SHU is Warden Carroll's general policy during his tenure as warden that an individual could be considered for housing in the SHU pretrial area based upon the security needs of the institution and the determination that the individual presented a significant security risk if housed in the general pretrial unit. A defendant in a civil rights action must have personal involvement in the alleged wrongs in order to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved. *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). While it is clear that Warden Carroll's policy was applied to Sykes when he was transferred to SHU pretrial, doing so did not violate Sykes' constitutional rights.

Thus, the Court concludes that Sykes has failed to produce evidence from which a reasonable jury could find he satisfied the objective component of his substantive due process claim. It is evident that the restrictions imposed upon him were reasonably related to the legitimate goal of maintaining Sykes' safety, as well as the security of the prison. There is no evidence of record of a purposeful intent on the part of prison officials to punish Sykes. For these reasons, the Court will grant Defendants' Motion for Summary Judgment and will deny Sykes' Motion for Summary Judgment.

11

## 2.     Procedural Due Process

"Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in the SHU without explanation or review of their confinement." *Stevenson*, 495 F.3d at 69. "The protections due to sentenced inmates provide a floor for what pretrial detainees may expect." *Id.* at 69. In the context of a sentenced inmate who received periodic review of his status (and was permitted to respond), the Third Circuit explained that, "we have no difficulty concluding that *eight years* in administrative custody, with no prospect of immediate release in the near future, is 'atypical' in relation to the ordinary incidents of prison life." *Shoats v. Horn*, 213 F.3d 140, 144-46 (3d Cir. 2000) (emphasis added). However, the same Court also determined that it is *not* atypical to be exposed to conditions of administrative custody for periods as long as *fifteen months*, as such stays are within the expected parameters of an inmate's sentence. *See, e.g.*, *Griffin v. Vaughn*, 112 F.3d 703 (3d Cir. 1997).

Prison officials must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell*, 441 U.S. at 521. With respect to procedural due process, the procedures required by *Wolff v. McDonnell*, 418 U.S. (1974), apply if the restraint on liberty is imposed for disciplinary reasons; if, instead, the restraint is for "administrative" purposes, the minimal procedures outlined in *Hewitt v. Helms*, 459 U.S. 460 (1983), are all that is required. *See Stevenson*, 495 F.3d at 70. "The degree of process required varies depending on the reason for the transfer, with greater process accorded to prisoners who are confined for disciplinary infractions than those moved for purely administrative reasons." *Id.*

12

Prison officials must provide pretrial detainees who are transferred into more restrictive housing for administrative purposes an explanation of the reason for their transfer as well as an opportunity to respond. *See Stevenson*, 495 F.3d at 70. An informal nonadversary review may be adequate, and can be satisfied when an inmate receives "some notice" and "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt*, 459 U.S. at 476. The opportunity to respond may be satisfied by a written statement by the inmate. *See id.* Due to the unique exigencies of prison management, and in accordance with *Hewitt*, the exchange of paperwork need not occur prior to the transfer of a detainee. *See Stevenson*, 495 F.3d at 71.

Sykes was placed in SHU pretrial following the "proof positive" hearing, at which it was determined that the State presented sufficient evidence to allow it to seek the death penalty. Sykes' file was reviewed and prison officials took note that his case had received significant media attention. According to Sykes, no reason was given for his move, there was no hearing to allow him to respond to any allegations, and there was no review of his status during the fifteen months he was housed in SHU. Yet, the record reflects that once Sykes was housed in SHU, Counselor Johnson provided Sykes a reason for his transfer (i.e., because of the possible penalty he could receive). Sykes was given an opportunity to present his views regarding the transfer to prison officials when he submitted his grievance on October 27, 2005 and again when he wrote to prison officials on numerous occasions. Finally, it is apparent from the record that Sykes was not placed in SHU pretrial for an indefinite period. Rather, he was housed there while awaiting his capital trial. Once Sykes was sentenced, he was given a new housing assignment.

13

Considering these facts, the Court concludes that Sykes received the minimal procedural due process protections he was due. Moreover, there is no evidence implicating personal involvement on behalf of any Defendant with regard to Sykes' procedural due process rights. Based upon the record, a reasonable jury could not find violations of Sykes' right to procedural due process. Therefore, the Court will deny Sykes' Motion for Summary Judgment on the issue and will sua sponte grant Defendants' summary judgment on the procedural due process issue.[6] Even if Sykes is correct in his contention that his due process rights were violated, as discussed below, Defendants are entitled to qualified immunity.

## C. **Qualified Immunity**

Qualified immunity shields state officials from monetary damages unless: (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, __U.S.__, 131 S.Ct. 2074, 2080 (2011). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 2085 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

---

[6]Defendants' Motion for Summary Judgment does not specifically refer to procedural due process but speaks, generally, to Sykes' right to due process. "It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment sua sponte." *Couden v. Duffy*, 446 F.3d 483, 500 (3d Cir. 2006) (internal quotation marks omitted). This may not occur, however, "without placing the adversarial party on notice that the court is considering a sua sponte summary judgment motion and providing that party an opportunity to present relevant evidence in opposition to that motion." *Couden*, 446 F.3d at 500. Notice is satisfied if "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Id.* Here, Sykes raised the issue in his Motion for Summary Judgment and all parties addressed the issue in responses and replies.

Courts have the discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand. *See*

*Pearson v. Callahan*, 555 U.S. 223, 237 (2009). Assuming arguendo, that Sykes' constitutional

rights were violated, the Court turns to the second prong of the qualified immunity test, to

determine whether the rights at issue were clearly established. "A Government official's conduct

violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a]

right [are] sufficiently clear' that every 'reasonable official would have understood that what he

is doing violates that right.'" *Id.* at 203 (citing *Anderson v. Creighton*, 483 U.S. 635, 640

(1987)). This standard "does not require a case directly on point" but does require that "existing

precedent must have placed the statutory or constitutional question beyond debate." *Id.* For a

right to be clearly established, the Third Circuit has instructed that "there must be sufficient

precedent at the time of the action factually similar to the plaintiff's allegations, to put [the]

defendant on notice that his or her conduct is constitutionally prohibited." *McKee v. Hart*, 436

F.3d 165, 171 (3d Cir. 2006) (internal quotation marks omitted).

The facts surrounding Sykes' transfer to SHU pretrial in 2005 are unique. Until the Third

Circuit issued its ruling in *Stevenson*, on July 30, 2007, over two years after the time Sykes had

been moved to SHU as a pretrial detainee, no precedent existed that spoke to the issue of

administrative detention of pretrial detainees facing capital punishment coupled with the security

concerns of prison officials. What authority did exist was a Third Circuit opinion to the effect

that a sentenced inmate "could conceivably be held in administrative custody merely because his

prior crimes reasonably foreshadow future misconduct." *Shoats*, 213 F.3d at 146.

15

In addition, *Stevenson* does not specifically describe the type of procedural process due. For example, administrative detention requires only an "informal nonadversary review" that "need not be extensive." *Stevenson*, 495 F.3d at 70, 71. Detainees must be provided "only an explanation of the reason for their transfer as well as an opportunity to respond," and all that is required is a "minimal exchange of paperwork" that need not occur prior to the transfer. *Id.*

Sykes was confined to SHU pretrial in early 2005, when prison officials' relied upon the findings in the "proof positive" hearing that the State intended to seek the death penalty. Given the Third Circuit's pronouncement that a sentenced inmate could conceivably be held in administrative custody merely because his prior crimes reasonably foreshadow future misconduct, coupled with the fact that Sykes' stay in SHU was time-limited while he awaited trial, the security concerns of the institution, the review of Sykes' file prior to the transfer, Johnson's explanation of the transfer to Sykes, and Sykes' subsequent grievance complaining of the transfer, it cannot be said that Defendants were unreasonable in their belief that the Constitution did not require formal notice to Sykes, a formal hearing,[7] or subsequent reviews while Sykes awaited trial. Nothing suggests that Defendants were "plainly incompetent" or that they "knowingly violate[d] the law." *al-Kidd*, 131 S.Ct. at 2085.

_____

[7]Defendants take the position that the DOC was not required to hold a separate administrative hearing because Sykes was represented by counsel and received a fair hearing during the "proof positive" proceedings. The Court thoroughly reviewed the transcripts of the "proof positive" hearing. The issue considered was whether the State had sufficient evidence to proceed in seeking the death penalty, not whether Sykes' housing assignment would change to SHU pretrial upon the finding that the State could seek the death penalty. Sykes' housing status is never mentioned. Nor do the transcripts indicate the presence at the hearing of prison personnel responsible for reviewing Sykes' housing status.

16

Accordingly, the Court finds that Defendants are entitled to qualified immunity. To rule otherwise would deny Defendants the "breathing room" required by *al-Kidd* to make reasonable judgments regarding the procedural due process requirements for pretrial detainees who face capital trials. The Court will grant Defendants' Motion for Summary Judgment in this regard.

## V.     CONCLUSION

For the above reasons, the Court will grant Defendants' Motion for Summary Judgment and will deny Plaintiff's Motion for Summary Judgment. An appropriate Order follows.